ALTOONA ELECTRICAL, ENGINEERING & SUPPLY CO. v. KITTANNING & F. C. ST. RY. CO.

(Circuit Court, W. D. Pennsylvania. December 17, 1903.)

1. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—EQUITY JURISDICTION.
   A court of equity has jurisdiction of a suit to compel the specific performance by a corporation of a contract to deliver a specified amount of its capital stock in payment for work which gave to such stock its only value, and where the entire capital stock is small, and presumably has no general market value; nor is such jurisdiction lost by the fact that after the filing of the bill the stock is sold by defendant to others, but will be retained to determine and award complainant compensation therefor.

2. EQUITY JURISDICTION—WAIVER OF OBJECTION.
   A defendant, by answering to the merits of a bill and going to hearing without objection, waives the right to object that the suit is not cognizable in equity, where the subject-matter is within general equitable jurisdiction.

3. CONTRACTS—PERFORMANCE—ESTOPPEL.
   A corporation which contracted with another for the construction by the latter of an electric railway line, to be completed within a stated time, agreeing to procure the right of way, is estopped to insist on the time limit in defense to an action for the contract price, or that the work was not fully completed, where the delay was in large part, and the noncompletion entirely, due to its own default in failing to procure right of way.

4. SAME—DAMAGES FOR BREACH.
   Where complainant contracted to build an electric railway line for defendant, which agreed to procure the right of way, and represented that it had done so, but in fact failed to obtain a right of way over certain parts of the line, by reason of which it could not be completed to the full length contemplated by the contract, complainant was entitled to recover the direct profits it was prevented from earning under the contract by such default of defendant.

In Equity.

Patterson & Hare and J. S. & E. G. Ferguson, for complainant.
Watson & McCleave, for respondent.

ACHESON, Circuit Judge. This bill is based upon a written contract, dated November 7, 1898, between the above-named parties, whereby the plaintiff, the Altoona Electrical, Engineering & Supply Company, undertook and agreed, at its own expense, to provide all material for, and construct and equip, as provided in the contract, for the defendant, the Kittanning & Ford City Street Railway Company, a line of railroad, to be operated electrically, extending from the Neilton plan of lots, in Rayburn township, Armstrong county, through

¶ 2. See Equity, vol. 19, Cent. Dig. § 120.

said township, Kittanning borough, Manor township, and Manorville borough, into Ford City, at a point where Fourth avenue and Sixth street cross, of the length of about five miles. The work on the railway was to be begun by the plaintiff immediately after the date of the contract, and, subject to certain contingencies and specified exceptions, was to be completed not later than the 1st day of April, 1899. The defendant company covenanted and agreed to secure all rights of way, and, where the railway should cross or run upon a public highway, street, lane, or alley, secure the consent of the proper municipal authorities, in writing, and, where the railway should run over or along township roads, secure the consent of the supervisors of roads, and the consent in writing of the abutting landowners and all persons having an estate therein, before the work should be begun. The bill alleges that, before the plaintiff company began work under the contract, it was informed by the defendant company that the latter had procured rights of way over the entire line of railway, as described in the contract. This allegation, I find, is sustained by the weight of the evidence. The plaintiff began work immediately after the execution of the contract, and prosecuted the work with reasonable diligence, in view of all the circumstances. The defendant company had not procured rights of way along the entire line of the railway from the Neilton plan to its other terminus in Ford City. It never procured a right of way over the Graham property—a distance of about 700 feet—at the northern end of the line adjoining the Neilton plan of lots, nor a right of way at its southern end from the line of the Pittsburgh Plate Glass Company's property, and over the same, and to the terminus in Ford City, a distance of about 4,435 feet. It further appears that during the progress of the work there were disputes and difficulties with other landowners with reference to the right of way, which retarded the work. The work, except at the abovementioned places at or near the termini where the right of way had not been procured, was completed about the 1st day of March, 1900, and shortly thereafter the railway, as so constructed, was turned over to the defendant company, which has ever since been in possession of and has operated the same. The defendant company bound itself, in and by the contract, to deliver to the plaintiff company, in payment for the materials furnished and work done by it, $45,000 of the capital stock of the railway company, and $50,000 in first mortgage bonds, secured by a first mortgage executed to the Pittsburgh Trust Company, of Pittsburgh, as trustee. The entire capital stock of the defendant company was $50,000.

The main purpose of this bill was to compel the defendant company to deliver to the plaintiff the balance of stock and bonds to which it was entitled under the contract, and to restrain the defendant company, by injunction, from any other disposition of said stock and bonds. The defendant answered the bill on its merits, and did not thereby or otherwise raise any question as to the jurisdiction of the court to entertain the bill. In the defendant's brief, however, furnished the court since the argument of the case, the jurisdiction of the court to entertain the bill is challenged. Many cases, however, are to be found in the books where courts of chancery have enforced

specific performance of contracts relating to personalty, including contracts relating to stock of corporations. Mechanics' Bank of Alexandria v. Seton, 1 Pet. 299, 7 L. Ed. 152; 1 Story's Eq. Jur. §§ 724, 724a, 724b. The case before the court is a peculiar and exceptional one. The stock of the defendant corporation in its entirety was small, namely, $50,000. Presumably it could not be procured in the market, and it had no general market value. Whatever value it had was given to it by the plaintiff's work and expenditures. But if the defense which is suggested at this late day ever existed, it must be considered as having been waived, upon the principles enunciated by the Supreme Court of the United States in the cases of Reynes v. Dumont, 130 U. S. 354, 9 Sup. Ct. 486, 32 L. Ed. 934; Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594, 32 L. Ed. 1005; Brown v. Lake Superior Iron Company, 134 U. S. 530, 535, 536, 10 Sup. Ct. 604, 33 L. Ed. 1021. Nor does it affect the jurisdiction of the court, which attached upon the filing of the bill, that the evidence disclosed that before it was filed the defendant had sold the stock here in question, and that since the bill was filed it had sold the bonds. Although the specific relief sought cannot be granted, by reason of the defendant having disposed of these securities, yet the case must proceed for the ascertainment of a money compensation to be made the plaintiff, and a decree accordingly.

In respect to the time limit specified in the contract, two observations may be made. In the first place, it seems clear from the dealings of the parties that there was a waiver of the time limit; and, in the second place, the defendant is in no position to insist upon that time limit, because of its own defaults. It was particularly in default in that it never procured the right of way over the Graham property at the northern end of the line, nor over the property already mentioned at the southern end of the line. In regard to the performance of the contract, in so far as it was performed, it must be said that the testimony is very conflicting. Upon a careful consideration, however, of the whole evidence, my conclusion is, and I find, that there was substantial performance by the plaintiff in accordance with the terms of the contract and the specifications for the work, in so far as the defendant company secured a right of way. All the defenses, therefore, based upon the alleged nonperformance or defective performance, are overruled.

Here it may be proper to notice specially the defense relating to the ballasting of the road. The contract provides that the ballasting shall be "with such material as found along line." The evidence satisfies me that this provision was complied with.

The plaintiff does not claim damages by reason of the failure of the defendant to procure a right of way over the Graham property and the right of way at the Ford City end of the line. The plaintiff, however, does claim that it should be allowed for the profits which it would have made, had those rights of way been procured, and those portions of the line of railway built under the contract. On the other hand, the defendant contends that the plaintiff knew when it commenced work that these rights of way had not been procured, and that it took the risk of the defendant procuring them subsequently. I am unable

to accept the defendant's contention in this regard. I think the evidence shows that the plaintiff company entered upon the work upon the defendant's assurance that all rights of way had been procured. I am therefore of the opinion that the loss of direct profits growing out of the defendant's failure to procure these rights of way, which prevented the plaintiff from completing the line, ought to be taken into account. There is great conflict between the witnesses on the one side and the other as to what it would have cost the plaintiff to construct these uncompleted portions of the line of railway. According to the plaintiff's witnesses, that cost would not have exceeded about $5,400. According to the defendant's witnesses, however, the cost would have amounted to nearly $14,000. I think that the estimates of the plaintiff's witnesses are too low, and the estimates of the defendant's witnesses extravagant. From my best judgment, based upon a consideration of all the proofs, I conclude that the construction of those portions of the line would have cost the plaintiff $8,000. For this last sum, therefore, the defendant will be entitled to credit upon the contract price of the work.

As the basis of the account to be now stated between these parties, I take the contract price, namely...... $95,000 00
From this is first to be deducted the above-mentioned cost for completing the unfinished portions of the railway...... 8,000 00

$87,000 00

It is conceded that the defendant made partial payments in bonds and stocks, and is also entitled to other credits.
Appended to the answer is a statement (Exhibit A) of credits claimed by the defendant, and amounting to... $37,149 12
These credits, I think, are fairly established by the evidence, except the sum of...... 24 50
stamps on mortgages, which is manifestly improper.
The defendant is therefore entitled to a credit of...... $37,124 62 37,124 62

$49,875 38

The last above amount is the balance due upon the written contract, according to the foregoing findings of the court, to which, however, is to be added interest, the computation of which will be considered hereafter.

The plaintiff claims for extras outside of the written contract. In respect to this whole class of claims, I may say generally that the burden of proof to establish them is upon the plaintiff. No written order for any of these items is produced. As they are outside the terms of the written contract, these extras ought not to be allowed unless it clearly appears that they are furnished under an express or implied contract between these parties. The first item under this head is the sum of $1,138.70 for a piece of track 445 feet in length, diverging from the main line, and located on Vine street, in Kittanning. By the terms of the contract the plaintiff was to provide "all necessary turnouts and switches." By the weight of evidence the conclusion is justified that this construction on Vine street was put in as a turnout, and that this was the understanding of the parties when it was built. This claim is therefore disallowed. The next of

these extra charges is for a switchboard, at a cost of $370. According to the preponderance of the evidence, that switchboard was not ordered by the defendant, and was sent to Kittanning through the mistake of the plaintiff. The evidence justifies the conclusion that it was put up in the defendant's service with the understanding that no charge would be made therefor. I may here remark that this concession, or gift, is not so extraordinary, when we remember that the plaintiff, as the prospective owner of so large an amount of the stock and of the bonds of the defendant company, was so largely interested in its welfare. The third item of extras is for moving a generator, at a cost of $158. I think it is established by the weight of the evidence that this was a voluntary service by the plaintiff, for which no charge was to be made. The next item under the head of extras is for eight heaters, at a cost of $120; five registers, at a cost of $84; and four headlights, at a cost of $28. The contract required the plaintiff to "furnish and place on the road properly finished and fully equipped with necessary electrical appliances, with motors of at least 30 horse power, ready for use, four standard type closed street railway passenger cars." As the plaintiff put these appliances on the cars, I think it may fairly be assumed that plaintiff's own construction of the contract required the cars to be thus equipped. In the absence, then, of any direct evidence of an independent contract for these articles, this item of claim is disallowed. The plaintiff claims as an extra the cost of building a fence on Gault Hill, namely, the sum of $379.53. This fence was a necessary construction, and was required by the contract between the supervisors of the township and the defendant company. It was a proper expenditure, and the evidence shows, I think, that the fence was constructed by the plaintiff with the understanding that it should be reimbursed the expense by the defendant. I do not think that it comes within the provision of the contract whereby the plaintiff was "to comply with all the conditions and agreements and conditions imposed by the grant of the franchise of the party of the first part as to rights of way and borough ordinances which apply to and control the operation and construction of the said lines of railway." This item is allowed. I am not satisfied that the extra claim for $226.23 for the rails and cross-ties used by the defendant in constructing a second track into the car barn is just, in view of all the evidence, and it is disallowed. The claim for material left on hand at the cessation of the work, lying at or near Neilton's, I think, is not substantiated by the proofs. According to the clear weight of evidence, that material was not used by the defendant, but was levied upon and sold at a constable's sale under a judgment against the plaintiff company. I am not clear that the plaintiff pressed at the argument the claim for work done in putting the track in good order in the spring of 1890. But however this may be, I think the plaintiff was bound to do that work under the terms of the contract. It was necessary to put the road in good condition.

To the balance stated above, namely............................ $49,875 38
Is to be added the cost of the fence on Gault Hill................   379 53
                                                                 —————————
                                                                 $50,254 91

To this is to be added interest. As the work did not progress as contemplated in the contract, I am not prepared to say that the interest should be computed from the various dates when the stock and bonds were deliverable. I think substantial justice will be done by allowing plaintiff interest on the whole balance due it from the time when the road was turned over by the plaintiff to the defendant— say, from May 1, 1900.

The decree, therefore, will be in favor of the plaintiff for the sum of $50,254.91, with interest from May 1, 1900. Let counsel prepare a decree.